488 S.E.2d 901

**STATE of West Virginia ex rel. B.F. SMITH, Chief, Office of Waste Management, West Virginia Division of Environmental Protection, Plaintiff Below, Appellant,**

v.

**KERMIT LUMBER & PRESSURE TREATING CO., Duly Authorized Corporation, and Harrison Jude, an Individual, Jointly and Severally, Defendants Below, Appellees.**

No. 23831.

Supreme Court of Appeals of West Virginia.

Submitted April 23, 1997.

Decided June 24, 1997.

---

Mark J. Rudolph, Deputy Chief, Office of Legal Services, Charleston, for Appellant.

Cecil C. Varney, Varney Law Offices, L.C., Williamson, for Appellees.

McHUGH, Justice:

The appellant, B.F. Smith for and on behalf of the State of West Virginia as the Chief of the Office of Waste Management of the West Virginia Division of Environmental Protection (hereinafter the "DEP"), appeals the April 4, 1996 order of the Circuit Court of Mingo County which dismissed the DEP's action against the appellees, Kermit Lumber & Pressure Treating Company and Harrison Jude, stating that the matter was barred by the statute of limitations. The DEP filed a civil suit against the appellees on September 15, 1995, seeking to compel the appellees to clean up the hazardous waste at their business site and seeking civil penalties and damages from the appellees for "their dilatory and non-responsive acts." For reasons explained below, we reverse the circuit court's April 4, 1996 order and remand the case to the circuit court for further proceedings consistent with this opinion.

## I.

On April 1, 1977, Harrison Jude opened a lumber pressure treating business known as Kermit Lumber & Pressure Treating Company (hereinafter "Kermit Lumber") in Mingo County. Kermit Lumber leased the 6.7 acre business site from Norfolk and Western Corporation.

During a compliance evaluation inspection of Kermit Lumber in July of 1987 the DEP[1] first became aware that the Kermit Lumber business site was contaminated by chromium and arsenic. The DEP inspectors noted green staining, which is a sign of chromium and arsenic contamination, on the ground at the business site and down a steep embankment leading to the Tug Fork River. The site was tested revealing that the arsenic and chromium contamination was in excess of the regulatory limits set by the DEP. The DEP asserts that chromium and arsenic are considered hazardous wastes which are dangerous to human health and the environment if released into the environment in an amount above the regulatory limits.

After further investigation, the inspectors concluded that the contamination was a result of the pressure treatment process used by Kermit Lumber to treat the lumber.[2] The inspectors also concluded that multiple spills had occurred at the business site over a period of time.

Thus, on October 26, 1987, the DEP sent a proposed consent order to the appellees asking them to immediately remediate[3] the contamination and pay a modest civil penalty. In response, the appellees agreed to submit a plan which would more fully assess the degree of contamination at the business site, and with the DEP's approval to clean-up the contaminated area.

---

1. The Department of Natural Resources (hereinafter the "DNR") was the regulatory agency in these types of matters when the compliance evaluation inspection of Kermit Lumber occurred in July of 1987. Sometime after 1987 the DEP assumed the DNR's responsibility in regulating hazardous waste. However, we will refer only to the DEP in this opinion.

2. The appellees' foreman told the inspectors that Kermit Lumber had used an arsenic and chromium laced treatment process from 1977 until 1986.

3. The dictionary refers the reader to the word "remedial" when defining the term "remediate." See *Webster's Third New International Dictionary* 1920 (1970). The term "remedial" is defined as "affording a remedy: intended for a remedy or for the removal or abatement of a disease or of an evil[.]" *Id.*

Upon performing a follow-up inspection on April 25, 1988, the DEP discovered that the appellees had not done anything to remediate the contamination at the business site. Instead, the appellees had dismantled the business site by removing the buildings and pressure treating unit. The inspectors also discovered that the soil on the business site had been regraded to hide the contaminated soil and that potentially dangerous materials had been dumped into the river.[4]

Therefore, on July 8, 1988, the DEP issued a unilateral order requiring the appellees to submit a plan to monitor and test the soil and groundwater of the Kermit Lumber business site for chromium and arsenic. On September 24, 1988, Mr. Jude was indicted by the federal authorities for illegal storage, disposal and transportation of hazardous waste at and from the Kermit Lumber business site. On June 1, 1989, the DEP instituted a civil action against the appellees in the Circuit Court of Kanawha County alleging that the appellees had failed to rectify the contamination at the business site.

In the 1989 civil action, because of the pending federal criminal case and because the appellees insisted that the site was clean, the appellees and the DEP entered into a consent order dated July 26, 1989, in which the appellees agreed to hire an environmental consultant to perform a site assessment. The environmental consultant found that the business site was contaminated. The DEP states that it believed that the federal authorities in the pending criminal case would require Mr. Jude to clean up the site based on the environmental consultant's recommendations.

On August 17, 1989, Mr. Jude pled guilty to illegally *transporting* hazardous waste in the federal criminal action, paid a $75,000.00 fine and was placed on probation for three years. Mr. Jude was not required to clean up the business site, rather he was required to comply with the July 26, 1989 consent order entered in the 1989 civil action, which required the appellees to hire an environmental consultant to perform a site assessment.

In November of 1992 Mr. Jude was released from probation. Thereafter, the DEP notified the appellees of the high levels of arsenic found on the business site during its September 1992 inspection. Apparently, the DEP did not take any other immediate action after this notification.

In March of 1995 test results again revealed that the arsenic found at the business site exceeded the regulatory limits. A report reflecting these test results was sent to the appellees. On May 9, 1995, the DEP issued a unilateral order demanding that the appellees remediate the site. The appellees did not appeal the order to the Environmental Quality Board. Thus, the order became final after thirty days elapsed. *See W.Va.Code,* 22B–1–7 [1994].

Because no action had been taken by the appellees in response to the May 9, 1995 unilateral order, the DEP filed a civil action in the Circuit Court of Mingo County on September 15, 1995. In this civil action the DEP alleged in count 1 of its complaint that the appellees had improperly generated, stored and disposed of hazardous waste without a permit at its business site in Mingo County in violation of *W.Va.Code,* 22–18–8(a) [1994] of the Hazardous Waste Management Act. The DEP's complaint further alleged in count 2 that the appellees discharged hazardous material into waters of the State without a permit in violation of *W.Va.Code,* 22–11–8(b)(1) [1994] of the Water Pollution Control Act. Lastly, the DEP's complaint alleged in count 3 that the appellees were liable under the theory of common law public nuisance "because of their acts and/or because of their failing to perform their required legal duty and by causing conditions to exist which endangers public health, safety and the environment." As previously noted, the DEP sought to compel the appellees to clean up the hazardous waste at their business site and sought civil penalties and damages from the appellees "for their dilatory and non-responsive acts."

In response, the appellees filed a motion to dismiss the DEP's complaint pursuant to

---

4. The appellees state that on May 31, 1988, Kermit Lumber gave up its lease and vacated the business site where the arsenic and chromium contamination was alleged to have occurred.

*W.Va.R.Civ.P.* 12(b). On April 4, 1996, the circuit court granted the appellees' motion to dismiss the DEP's civil action stating that the civil action was barred by the statute of limitations. It is this order that the DEP appeals.

## II.

### A.—Standard of Review

█ At the outset, we note that "[a]ppellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*" Syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995). As we recently explained in *Scott Runyan Pontiac–Buick,* "[c]omplaints are to be read liberally as required by the notice pleading theory underlying the West Virginia Rules of Civil Procedure." *Id.* at 776, 461 S.E.2d at 522 (citations omitted). Thus,

'[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Syl. pt. 3, *Chapman v. Kane Transfer Co.,* 160 W.Va. 530, 236 S.E.2d 207 (1977) *citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99 [101–02] 2 L.Ed.2d 80 (1957).

Syl. pt. 3, *Mandolidis v. Elkins Industries, Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978).[5] *See also Scott Runyan Pontiac–Buick,* 194 W.Va. at 776, 461 S.E.2d at 522.

### B.—Common Law Doctrine of *Nullum Tempus Occurrit Regi*

The first issue is whether the common law doctrine of *nullum tempus occurrit regi* prevents a statute of limitations from barring the civil action brought by the DEP when the DEP was acting in the public interest by bringing such action. As we explained in *In re State Public Building Asbestos Litigation,*

193 W.Va. 119, 127, 454 S.E.2d 413, 421 (1994), *cert. denied, W.R. Grace & Co. v. West Virginia,* 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995), the phrase *nullum tempus occurrit regi* literally means "time does not run against the King." This common law rule

has existed as an element of the English law from a very early period.... The common law fixed no time as to the bringing of actions. Limitations derive their authority from statutes. The king was held never to be included, unless expressly named. No laches was imputable to him. These exemptions were founded upon considerations of public policy. It was deemed important that, while the sovereign was engrossed by the cares and duties of his office, the public should not suffer by the negligence of his servants....

When the colonies achieved their independence, each one took these prerogatives, which had belonged to the crown; and when the national Constitution was adopted, they were imparted to the new government as incidents of the sovereignty thus created.

*United States v. Thompson,* 98 U.S. 486, 489–90, 25 L.Ed. 194, 195 (1878). *See also Ralston v. Town of Weston,* 46 W.Va. 544, 547–48, 33 S.E. 326, 327–28 (1899).

█ Likewise, when West Virginia adopted its constitution it also adopted the common law rule of *nullum tempus occurrit regi* pursuant to *W.Va. Const.* art. VIII, § 13 which states: "Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State *until altered or repealed by the legislature.*" (art. VIII, § 13 formerly was art. VIII, § 21) (emphasis added).[6] Eventually, however, the legislature, pursuant to its authority under *W.Va. Const.* art. VIII, § 13, altered the common law rule of

---

**5.** *Mandolidis, supra* was superseded by statute on other grounds as stated in *Miller v. City Hospital, Inc.,* 197 W.Va. 403, 475 S.E.2d 495 (1996).

**6.** West Virginia adopted the following language found in the 1860 *Virginia Code* at chapter 42, section 23 which codified the common law rule of *nullum tempus occurrit regi:* "No statute of limitations which shall not in express terms apply to the commonwealth, shall be deemed a bar to any proceeding by, or on behalf of the same."

*nullum tempus occurrit regi* by expressly stating that "*[e]very statute of limitation, unless otherwise expressly provided, shall apply to the State.*" *W.Va.Code,* 55–2–19 [1923]. *See Riffle v. Skinner,* 67 W.Va. 75, 90, 67 S.E. 1075, 1082 (1910) (Brannon, J., concurring) (Until 1868 the rule *nullum tempus occurrit regi* applied). This Court recognized the abrogation of the common law rule of *nullum tempus occurrit regi* in syllabus point 5 of *In re State Public Building Asbestos Litigation, supra:* "*W.Va.Code,* 55–2–19 [1923] abrogates the common law doctrine of *nullum tempus occurrit regi* thereby making statutes of limitations applicable to the State.*" See also* syl. pt. 1, *State v. Mines,* 38 W.Va. 125, 18 S.E. 470 (1893) ("Section 20, c. 35, Code 1968 [which is now *W.Va.Code,* 55–2–19 [1923] [7], abolished the common-law rule, that no time runs against the State, and made the State's right subject to statutes of limitations, the same as individual rights.")

In the case before us, the DEP asserts that *W.Va.Code,* 55–2–19 [1923] only applies when the State is asserting its private or proprietary rights. The DEP maintains that if the State brings an action to protect public rights, then *W.Va.Code,* 55–2–19 [1923] is inapplicable. Essentially, the DEP argues that if the State brings an action to protect public rights, then no statute of limitations applies to bar the State's claim. Thus, the DEP concludes that because its claim against the appellees was brought to protect the public and the environment from hazardous waste, no statute of limitations would bar its claim.

■ We are not persuaded by the DEP's argument. Though at common law the doctrine of *nullum tempus occurrit regi* only applies when the State is asserting a right belonging to the general public, but does not apply when the State is asserting a proprietary right, *W.Va.Code,* 55–2–19 [1923] does not make such a distinction.[8]

Notwithstanding the fact that many jurisdictions still follow the common law doctrine of *nullum tempus occurrit regi,* many jurisdictions have acknowledged that the doctrine may be modified or abolished by statute. *See Commonwealth, Dept. of Public Welfare v. Maryland Casualty Co.,* 164 Pa.Cmwlth. 301, 643 A.2d 139, 141 (1994) ("If the statute of limitations expressly limits the time in which the Commonwealth may bring an action, then the doctrine of *nullum tempus* does not apply." (citations omitted)); *Shootman v. Dept. of Transportation,* 926 P.2d 1200, 1202 (Colo.1996) (" 'In the states that continue to follow the *nullum tempus* doctrine, "when filing lawsuits in the posture of plaintiffs, [the states] are immune from statutes of limitations *except where their respective legislatures have decided otherwise.*" ' " (emphasis added and citation omitted)); *Laramie County School District # 1 v. Muir,* 808 P.2d 797, 801 (Wyo.1991) (The doctrine of *nullum tempus occurrit regi* is to be applied in those cases where the State is asserting a public right, "*unless the legislature expressly includes governmental bodies as subject to the applicable statute of limitations or those governmental bodies are included within the statute by necessary application*[.]" (emphasis added)). *See generally* 51 Am.Jur.2d *Limitation of Actions* § 416 (1970) ("[T]he

---

7. Section 20, c. 35, Code 1868 stated: "Every statute of limitations, unless otherwise expressly provided, shall apply to the state, <u>but as to claims heretofore accrued, the time shall be computed as commencing when this chapter takes effect.</u>" (emphasis added). Several years later the above Code section was amended to its current version by striking the language that is underlined above: "Every statute of limitation, unless otherwise expressly provided, shall apply to the State." (See the 1887 *West Virginia Code* at chapter 35, section 20).

8. *See Trimble v. American Savings Life Ins. Co.,* 152 Ariz. 548, 733 P.2d 1131, 1138 (App.1986) (The doctrine of *nullum tempus occurrit regi* "ap-

plies if the right which the governmental unit seeks to assert is in fact a right belonging to the general public. It does not apply if the right belongs only to the government or to some small and distinct section of the public."); *Laramie County School District # 1 v. Muir,* 808 P.2d 797, 801 (Wyo.1991) (Before the doctrine of *nullum tempus occurrit regi* applies "[t]he right that is asserted must be one belonging to the general public[.]"). *See generally* 51 Am.Jur.2d *Limitation of Actions* § 416 (1970) (The rule that the statute of limitations does not apply to a state that is suing in its sovereign capacity does not apply when a state is exercising a private or proprietary right).

rule that the statute of limitations does not apply to the state when public rights are involved has been abrogated in some states by statute, either expressly or by clear implication." (footnote omitted)); 54 C.J.S. *Limitations of Actions* § 17 (1987) ("Unless it is expressly or by necessary implication provided otherwise by constitution or statute, statutes of limitation do not run against the sovereign, such as a state[.]" (footnotes omitted)).

■ As previously noted, we have concluded that the legislature abrogated the common law doctrine of *nullum tempus occurrit regi* by enacting *W.Va.Code*, 55–2–19 [1923]. *See* syl. pt. 5, *In re State Public Building Asbestos Litigation, supra*. Indeed, given the clear language in *W.Va.Code*, 55–2–19 [1923] that *"[e]very statute of limitation, unless otherwise expressly provided, shall apply to the State[,]"* the DEP's argument that this statute does not apply when the State is asserting public rights is significantly weakened. (emphasis added). The DEP's argument would require this Court to add language into *W.Va.Code*, 55–2–19 [1923].[9] As we have indicated in prior cases, " '[i]t is not for [courts] arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, *we are not obliged to add to statutes something the Legislature purposely omitted.'* " *Williamson v. Greene*, 200 W.Va. 421, 426, 490 S.E.2d 23, 28 (1997) (emphasis provided) (*quoting Banker v. Banker*, 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996)). Indeed, this Court has recognized that we have

no authority to construe a clear and unambiguous statute:

' "[w]hen a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute. Point 1, syllabus, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369 [135 S.E.2d 262 (1964) ]." Syllabus Point 1, *State ex rel. Board of Trustees v. City of Bluefield*, 153 W.Va. 210, 168 S.E.2d 525 (1969).' Syl. pt. 3, *Central West Virginia Refuse, Inc. v. Public Service Com'n of West Virginia*, 190 W.Va. 416, 438 S.E.2d 596 (1993).

Syl. pt. 2, *Keen v. Maxey*, 193 W.Va. 423, 456 S.E.2d 550 (1995). *See also* syl. pt. 1, *State v. Boatright*, 184 W.Va. 27, 399 S.E.2d 57 (1990) (" 'Courts always endeavor to give effect to the legislative intent, but a statute that is clear and unambiguous will be applied and not construed.' Syllabus Point 1, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968).").

It is for this reason that we find the DEP's reliance on *Ralston v. Town of Weston*, 46 W.Va. 544, 33 S.E. 326 (1899) and *Foley v. Doddridge County Court*, 54 W.Va. 16, 46 S.E. 246 (1903) to be misplaced. Both of these cases hold that no title by adverse possession can be acquired of land owned by the government and used for governmental purposes. In arriving at its conclusion the

---

**9.** There is a disagreement among jurisdictions as to whether the doctrine of *nullum tempus occurrit regi* should continue to be followed. More specifically, some courts have found that statutes of limitations should apply to the State because they " 'promote justice by discouraging delay and prohibiting the prosecution of stale claims.' " *Shootman v. Dept. of Transportation*, 926 P.2d 1200, 1206 (Colo.1996) (citation omitted and emphasis added).

However, other jurisdictions contend that the doctrine of *nullum tempus occurrit regi* is necessary: "Despite the abolition of sovereign immunity, the Illinois Supreme Court has held that the doctrine [of *nullum tempus* ] remains viable.... Its survival is supported by the policy of protecting the public from injury and loss due to the negligence of public officers in failing to timely

bring actions which belong to the public." *Evergreen Park School v. Federal Insurance Co.*, 276 Ill.App.3d 766, 213 Ill.Dec. 214, 216, 658 N.E.2d 1235, 1237 (Ill.Ct.App.1995) (citations omitted).

This Court will not decide which of these competing policies should guide this State. We have made clear that "[i]t is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten[.]" *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959) (citation omitted). *See also* syl. pt. 1, *Consumer Advocate Division of the Public Service Commission v. Public Service Commission*, 182 W.Va. 152, 386 S.E.2d 650 (1989).

Court in both *Ralston* and *Foley* concluded that notwithstanding the statutory language that "[e]very statute of limitation, unless otherwise expressly provided, shall apply to the state[,]" the statute of limitations did not prevent the government from reclaiming property claimed by adverse possession when the property was being used for a governmental purpose by the government. Both cases concluded that a statute of limitation will not bar an action brought by the State for public purposes. Furthermore, *Ralston* and *Foley* state that a statute of limitations will only apply when the State is bringing an action in its private or proprietary function.

At the outset, we note that "[u]nder the rule that, in the absence of legislation providing otherwise, the statute of limitations does not run against the government, title to public lands cannot be acquired by adverse possession as against any of the several states[.]" 3 Am.Jur.2d *Adverse Possession* § 269 (1986) (footnotes omitted). However, "[i]n some jurisdictions, it is expressly provided that the statute of limitations shall run against the state generally, or to a limited extent, and of course in that event its lands are as liable to effective adverse occupancy as are those of individuals." *Id.* (footnote omitted). Because the matter now before us does not involve adverse possession, we decline to further address whether title of public lands by adverse possession may be obtained.

However, because the language in *W.Va. Code*, 55–2–19 [1923] is unambiguous in stating that "[e]very statute of limitation, unless

otherwise expressly provided, shall apply to the State[,]" the language in *Ralston v. Town of Weston*, 46 W.Va. 544, 33 S.E. 326 (1899) and *Foley v. Doddridge County Court*, 54 W.Va. 16, 46 S.E. 246 (1903) which suggests that statutes of limitation apply only when the State is acting in its private or proprietary capacity, is misleading. Thus, to the extent that *Ralston* and *Foley* imply that *W.Va.Code*, 55–2–19 [1923] only applies when the State is acting in its private or proprietary capacity, they are hereby modified.[10]

Accordingly, because the legislature's intent in *W.Va.Code*, 55–2–19 [1923] could not be more clear, this Court must apply the plain language to this case and examine whether there are statutes of limitations which will bar any of the DEP's three counts.

### C.—The Hazardous Waste Management Act Count

We consider first whether there is a statute of limitations which applies to the count in the civil action brought by the DEP under the Hazardous Waste Management Act, found in *W.Va.Code*, 22–18–1 *et seq.*, and if so, when that statute of limitations begins to run.

### *Is there a relevant statute of limitations?*

As previously explained, the DEP alleged in count 1 of its complaint that the appellees had improperly generated, stored and disposed of hazardous waste without a permit at their business site in Mingo County in violation of *W.Va.Code*, 22–18–8(a) [1994] of the Hazardous Waste Management Act.[11] Thus,

10. The DEP also relies on *Rowan County Board of Education v. U.S. Gypsum Co.*, 87 N.C.App. 106, 359 S.E.2d 814, *review denied by*, 321 N.C. 298, 362 S.E.2d 782 (1987). *Rowan* involved a lawsuit brought by a board of education against a company who manufactured asbestos products which were put in public schools. The trial court had granted the asbestos manufacturer's motion for summary judgment after concluding that the board of education's claim was barred by the statute of limitation. The Court of Appeals of North Carolina reversed the trial court's ruling.

At issue was the meaning of the following language found in *N.C.G.S.* § 1–30 as quoted in *Rowan*, 359 S.E.2d at 816: "The limitations prescribed by law apply to civil actions brought in the name of the State, or for its benefit, in the same manner as to actions by or for the benefit

of private parties." The court concluded that the above language meant that "statutes of limitations will run against the State, when its purpose is proprietary, unless it is expressly excluded therein. Statutes of limitation will not run against the State when its purpose is governmental, unless the State is expressly included therein." *Id.*, 359 S.E.2d at 818. In that we find that our statute clearly states that "[e]very statute of limitation, unless otherwise expressly provided, shall apply to the State[,]" *W.Va.Code*, 55–2–19 [1923], we decline to follow the analysis in *Rowan, supra*.

11. *W.Va.Code*, 22–18–8(a) [1994] states, in relevant part:

No person may own, construct, modify, operate or close any facility or site for the treatment,

the DEP sought to impose a civil penalty under the Hazardous Waste Management Act not to exceed $25,000.00 for each day the appellees are in violation of the Act. *See W.Va.Code*, 22–18–17(b) [1994] (Provides for the imposition of a civil penalty). The DEP also sought, *inter alia*, to have the appellees remediate and clean-up the contaminated soil. *See W.Va.Code*, 22–18–14(e) [1994].

Under the Hazardous Waste Management Act, the DEP may bring enforcement proceedings against "[a]ny person undertaking, without a permit, any of the activities for which a permit is required[.]" *W.Va.Code*, 22–18–8(e) [1994], in relevant part. Furthermore, in that one of the purposes of the Act is "[t]o protect the public health and safety and the environment from the effects of the improper, inadequate or unsound management of hazardous wastes[,]" *W.Va.Code*, 22–18–2(b)(1) [1994], the DEP is authorized to issue an order requiring that any hazard or risk of hazard found in the environment be eliminated. *See W.Va.Code*, 22–18–14(e) [1994] and *W.Va.Code*, 22–18–15(a)(1) [1994].[12] Additionally, the DEP may "commence a civil action against any person who fails or refuses to comply with any order issued under this section [of the Hazardous Waste Management Act]." *W.Va.Code*, 22–18–14(f) [1994]. *See also W.Va.Code*, 22–18–15(a)(3) [1994].[13]

As previously noted, the DEP entered a unilateral order dated July 8, 1988 under the Hazardous Waste Management Act requiring the appellees to submit to the DEP "a proposal for carrying out any and all monitoring, testing, and analyses required to determine the extent and distribution of soil, surface water and/or groundwater contamination caused by the disposal of arsenic- and chromium-containing hazardous waste ..." at the Kermit Lumber site. Because the appellees did not comply with the July 8, 1988 order, the DEP filed a civil action in the Kanawha County Circuit Court on June 1, 1989 which resulted in a Consent Order being entered on July 19, 1989 pursuant to the Hazardous Waste Management Act. The consent order provided, *inter alia*, that the appellees were to submit a "proposal for an assessment of [the Kermit Lumber site]. The assessment proposal [was to] include ... sampling and analysis of the soils at the site."

The DEP took no further action until May 9, 1995, when it issued a unilateral order under the Hazardous Waste Management Act. This order required the appellees to "submit ... a proposed plan ... for the carrying out of any and all sampling and analysis required to determine the extent of contamination caused by the disposal of hazardous waste ... at the [Kermit Lumber] site." The proposed plan was to also include, *inter alia*, "[a]n explanation of all clean-up activities to be undertaken at any location where hazardous waste contamination is determined." The appellees did not appeal this order to the environmental quality board. *See W.Va.Code*, 22–18–20 [1994] (Provides that any person adversely affected by an order entered by the DEP under the Hazardous Waste Management Act may appeal to the environmental quality board in accordance with the procedures set forth in *W.Va.*

storage or disposal of hazardous waste identified or listed under this article, nor shall any person store, treat or dispose of any such hazardous waste without first obtaining a permit from the director [of the DEP] for such facility, site or activity and all other permits required by law.

**12.** *W.Va.Code*, 22–18–14(e) [1994] states: "If the monitoring, testing, analysis and reporting conducted pursuant to this section indicates that a potential hazard to human health or the environment may or does exist, the director may issue an appropriate order requiring that the hazard or risk of hazard be eliminated."

*W.Va.Code*, 22–18–15(a)(1) [1994] states that if the DEP

upon inspection, investigation or through other means observes, discovers or learns of a violation of the provisions of this article, any permit, order or rules issued or promulgated hereunder [it] may:

(1) Issue an order stating with reasonable specificity the nature of the violation and requiring compliance immediately or within a specified time. An order under this section includes, but is not limited to, any or all of the following: ... orders requiring a person to take remedial action or cease and desist orders[.]

**13.** As part of its enforcement arsenal the Hazardous Waste Management Act also provides for citizen suits in *W.Va.Code*, 22–18–19 [1994] and for criminal penalties in *W.Va.Code*, 22–18–16 [1994]. Neither of these statutes is at issue in the case before us.

*Code,* 22B–1–1 *et seq.*). Thus, the DEP asserts that this order became final after thirty days. *See W.Va.Code,* 22B–1–7 [1994]. The DEP filed the civil action presently at issue to enforce the May 9, 1995 order.

The appellees assert that they are not required to respond to the DEP's May 9, 1995 order because the statute of limitations bars any action brought by the DEP. As indicated above, the DEP knew, as early as 1988, of the contamination at the Kermit Lumber business site and filed a civil action on June 1, 1989 to address the contamination at the Kermit Lumber business site. Notwithstanding the consent order entered on July 19, 1989, the DEP waited until May 9, 1995 to enter another order requiring the appellees to address the contamination at the Kermit Lumber business site.

At the outset, we note that there is no provision within the Hazardous Waste Management Act which compels the DEP to enter orders under the Act within a specified time period. Nor is there any provision which sets forth a specified time period in which the DEP must file civil actions in order to enforce its orders. The Hazardous Waste Management Act is silent as to whether there are any applicable statutes of limitations.

The appellees argue that because the Hazardous Waste Management Act is silent, the general limitations of actions and suits in Chapter 55, article 2 of the *West Virginia Code* apply. More specifically, the appellees argue that the following language in *W.Va. Code,* 55–2–12 [1959] is applicable to civil actions brought under the Hazardous Waste Management Act:

> *Every personal action* [14] *for which no limitation is otherwise prescribed shall be brought:* (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) *within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.*

(emphasis and footnote added). We agree. *W.Va.Code,* 55–2–12(c) [1959] clearly and unambiguously states that *"[e]very personal action for which no limitation is otherwise prescribed shall be brought* ... within one

---

**14.** As explained in 1A C.J.S. *Actions* § 66 (1985), "[t]he common law divides actions into three classes, namely, real, personal and mixed." (footnote omitted). Real actions are defined as actions "brought for the specific recovery of lands, tenements, or hereditaments." 1 Am.Jur.2d *Actions* § 32 (1994) (footnote omitted). Personal actions have been defined at common law as including "all actions whether local or transitory that do not seek the specific recovery of lands, tenements, or hereditaments." 1A C.J.S. *Actions* § 66 (1985) (footnote omitted). *See also* 1 Am. Jur.2d *Actions* § 32 (1994) (Personal actions are those actions "brought for the recovery of personal property, for the enforcement of a contract or to recover for its breach, or for the recovery of damages for an injury to the person or property." (footnote omitted)). More succinctly, "[a]t common law, *personal* actions were those for the recovery of movable property, damages, *or other forms of redress,* as opposed to *real* actions which were for the recovery of lands, tenements, hereditaments, or for the protection of real property interests." *State ex rel. Schones v. Town of Canute,* 858 P.2d 436, 440 n. 3 (Okl.1993) (Opala, J., dissenting) (*citing Mathews v. Sniggs,* 75 Okla. 108, 182 P. 703, 708 (1919) (emphasis provided and added)). *See also* 1A C.J.S. *Actions* § 66 (1985) ("Mixed actions, as the name implies, are

such as appertain in some degree to both real and personal actions, and therefore are reducible to neither of them; such actions seek not only a specific recovery of lands, tenements, or hereditaments, but also a recovery of damages for an injury sustained." (footnotes omitted)).

Our general provisions for limitations of actions and suits found in *W.Va.Code,* 55–2–1 *et seq.* follow these common law distinctions by separately providing for statutes of limitations for real actions, *see, e.g., W.Va.Code,* 55–2–1 [1923], and statutes of limitations for personal actions, *see, e.g., W.Va.Code,* 55–2–12 [1959]. Though we recognize that "[i]n most jurisdictions these common-law forms of actions have been abolished, and in their place the civil action has been substituted[,]" 1 Am.Jur.2d *Actions* § 32 (1994) (footnote omitted), our legislature has declined to abolish these common law distinctions. It is therefore with the above-described distinctions in mind that we must analyze the facts before us.

Accordingly, in this case, we find that because the DEP's Hazardous Waste Management Act count obviously does not fall within the definition of a "real action," it is therefore in the nature of a "personal action."

year next after the right to bring the same shall have accrued[.]" (emphasis added). Thus, this Court must apply *W.Va.Code*, 55–2–12(c) [1959] to civil actions brought under the Hazardous Waste Management Act.[15] *See* syl. pt. 2, *Keen, supra* (When a statute is clear and unambiguous it is the duty of the Court not to construe but to apply the statute).

■ Accordingly, we hold that *W.Va.Code*, 55–2–12(c) [1959], which clearly and unambiguously states that "[e]very personal action for which no limitation is otherwise prescribed shall be brought ... within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative[,]" applies to civil actions brought under the Hazardous Waste Management Act found in *W.Va.Code*, 22–18–1 *et seq.*

### *When does the relevant statute of limitations begin to run?*

The question remains as to when *W.Va. Code*, 55–2–12(c) [1959] begins to run in a civil action brought under the Hazardous Waste Management Act. *W.Va.Code*, 55–2–12(c) [1959] states: "Every personal action for which no limitation is otherwise prescribed shall be brought ... *within one year next after the right to bring the same shall have accrued*[.]" (emphasis added). Our focus is on determining when the right to bring a civil action under the Hazardous Waste Management Act "accrues." This issue is one of first impression for this Court.

■ Because the language in *W.Va. Code*, 55–2–12(c) [1959] is not helpful in ascertaining what the legislature meant by "accrue" in the context of an enforcement proceeding brought pursuant to the Hazardous Waste Management Act, we must examine the language used by the legislature in the

Act in order to ascertain and give effect to the legislature's intent. In so doing, we are mindful that " '[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syl. Pt. 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 2, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984). Moreover, " '[i]n ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 3, *Hott, supra.*

The legislature expressly declared that the purposes of the Hazardous Waste Management Act are, *inter alia:*

(1) To protect the public health and safety and the environment from the effects of the improper, inadequate or unsound management of hazardous wastes;

(2) To establish a program of regulation over the storage, transportation, treatment and disposal of hazardous wastes;

(3) To assure the safe and adequate management of hazardous wastes within this state; and

(4) To assume regulatory primacy through Subtitle C of the Resource Conservation and Recovery Act.[16]

*W.Va.Code*, 22–18–2(b) [1994] (footnote added). In order to accomplish its goals the legislature designated the DEP to "take all action necessary or appropriate to secure to this state the benefits of said legislation." *W.Va.Code*, 22–18–4 [1994], in relevant part.

At issue in this case is the DEP's authority to impose civil penalties pursuant to *W.Va. Code*, 22–18–17(a)(1) and 17(b) [1994] and to institute civil actions pursuant to *W.Va.Code*, 22–18–17(c) [1994]. These *Code* sections use

---

**15.** This Court has previously recognized that the one-year statute of limitations found in *W.Va. Code*, 55–2–12(c) [1959] applies to a suit brought for purposes of imposing a civil penalty. *See Gawthrop v. Fairmont Coal Co.*, 74 W.Va. 39, 81 S.E. 560 (1914). *See also Snodgrass v. Sisson's Mobile Home Sales, Inc.*, 161 W.Va. 588, 244 S.E.2d 321 (1978).

**16.** The Resource Conservation and Recovery Act is found at 42 U.S.C. § 6901 *et seq.* and is the federal counterpart to our state Hazardous Waste Management Act.

a form of the term "violates" in describing when the DEP may use its authority to impose civil penalties or institute civil actions in order to further the purposes of the Hazardous Waste Management Act. More specifically, *W.Va.Code*, 22–18–17(a)(1) [1994] states, in relevant part, that "[a]ny person who *violates* any provision of this article, any permit or any rule or order issued pursuant to this article is subject to a civil administrative penalty[.]" (emphasis added). *W.Va. Code*, 22–18–17(b) [1994] states:

> Any person who *violates* any provision of this article, any permit or any rule or order issued pursuant to this article is subject to a civil penalty not to exceed twenty-five thousand dollars for each day of such violation which penalty shall be recovered in a civil action either in the circuit court wherein the violation occurs or in the circuit court of Kanawha County.

(emphasis added). *W.Va.Code*, 22–18–17(c) [1994] states, in relevant part, that "[t]he director [of DEP] may seek an injunction, or may institute a civil action against any person *in violation* of any provisions of this article or any permit, rule or order issued pursuant to this article." (emphasis added).

■ Clearly, then, civil penalties may be imposed or a civil action brought under the Hazardous Waste Management Act *only* when a person "violates" or is "in violation" of the provisions of the Hazardous Waste Management Act or "any permit, rule or order issued pursuant to" the Act. Thus, a claim under the Act would "accrue" when any person "violates" or is "in violation" of "any provisions of [the Hazardous Waste Management Act] or any permit, rule or order issued pursuant to this article." *W.Va. Code*, 22–18–17(c) [1994].

■ In the case before us, the DEP has alleged in its complaint that arsenic is currently on the ground at the Kermit Lumber business site in levels above the regulatory limits. Therefore, we conclude that because the DEP has alleged that the appellees are currently "in violation" of the Hazardous Waste Management Act, the statute of limitations has not yet begun to run. Indeed, as long as the arsenic remains on the ground in amounts above the regulatory limits the statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] does not "accrue." This construction of the Hazardous Waste Management Act enables the DEP to further the purposes of the Act by protecting "the public health and safety and the environment from the effects of the improper, inadequate or unsound management of hazardous wastes[,]" *W.Va.Code*, 22–18–2(b)(1) [1994], and thus, gives "effect to the intent of the Legislature." Syl. pt. 2, *Hott, supra*.

Notwithstanding the fact that the case law in other jurisdictions on this issue is confusing and inconsistent, other courts have come to a similar conclusion. Although not directly on point, the case *3M Co. (Minnesota Mining and Manufacturing) v. Browner*, 17 F.3d 1453 (D.C.Cir.1994) is enlightening because an understanding of that case will aid us in explaining how the relevant cases came to their conclusions.

One of the issues in *3M Co.* involved determining when the statute of limitations began to run on an administrative complaint filed by the Environmental Protection Agency (hereinafter the "EPA") under the Toxic Substances Control Act. The statute of limitations at issue in *3M Co.* is not found in the Toxic Substances Control Act, rather it is found in the general provisions of the United States Code governing judicial procedure. The provision reads, in relevant part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date *when the claim first accrued* [.]

28 U.S.C. § 2462 (emphasis added). The United States Court of Appeals of the District of Columbia Circuit concluded in *3M Co., supra*, that the five-year period began to run when the violation occurs, rather than when it is discovered by the EPA.[17]

---

**17.** The Court in *3M Co., supra*, concluded that the discovery rule was unworkable and, thus, inapplicable in a proceeding brought by the EPA under the Toxic Substances Control Act:

This holding is important because of how the EPA has responded to it. As noted by the American Law Institute, "[i]n an attempt to soften the effect of [the *3M Co.*] ruling, [the] EPA has since taken the position that violations are considered 'ongoing' until corrected, and that the statute of limitations only begins to run once such corrections have been made." Jose R. Allen and Stacy S. Erwin, SB73 ALI–ABA 239, 257 *Recent Developments in Environmental Litigation* (January 23, 1997). This position of the EPA was subsequently upheld in *United States v. Reaves,* 923 F.Supp. 1530 (M.D.Fla.1996).

In *Reaves* the United States brought a civil action under the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 against the defendant seeking injunctive relief and civil penalties for his unpermitted discharge of dredged or fill materials into wetlands. In the summer of 1981, the defendant had excavated a creek in order to create a canal. He put the material from the excavation into the wetlands. On December 6, 1989, the U.S. Army Corps of Engineers discovered the violation and issued a cease and desist letter on December 20, 1989. The U.S. Army Corps of Engineers denied the defendant's application for a permit for the discharge. Subsequently, on September 21, 1994, the U.S. government brought a civil action alleging that "until [the][d]efendant takes remedial steps to restore the waters to their condition and capacity prior to the discharge, his violation is a continuing one." *Id.* at 1533. Thus, the U.S. government contended that the five-year statute of limitations for civil penalties in 28 U.S.C. § 2462 did not bar its claim.

Conversely, the defendant asserted that the Clean Water Act and Rivers and Harbors

Act "claims 'accrued,' on the date of the underlying violation—in this case, June of 1981 [when the material was released into the wetlands]. As a result, [the][d]efendant assert[ed] that [the U.S. government's] claims both for injunctive relief and civil damages are barred by the statute of limitations, as this action was not filed until September 21, 1994, more than thirteen years later." *Id.* at 1533. The United States District Court disagreed with the defendant and held that the defendant's "unpermitted discharge of dredged or fill materials into wetlands on the site is a continuing violation for as long as the fill remains." *Id.* at 1534 (footnote omitted).

The case of *Gache v. Town of Harrison, N.Y.,* 813 F.Supp. 1037 (S.D.N.Y.1993) is even more analogous to the case before us as it involves the Resource Conservation and Recovery Act (hereinafter "RCRA") found in 42 U.S.C. § 6901 *et seq.* Our legislature has made clear that our state program for the management of hazardous waste "shall be equivalent to and consistent with the federal program established pursuant to Subtitle C of" the federal RCRA. *See W.Va.Code,* 22–18–23 [1994].[18] *See also W.Va.Code,* 22–18–2(b)(4) [1994] (States that one of the purposes of the Hazardous Waste Management Act is "[t]o assume regulatory primacy through Subtitle C of the Resource Conservation and Recovery Act."). Thus, the district court's analysis of RCRA in *Gache* is particularly instructive.

In *Gache,* the district court was confronted with, *inter alia,* whether summary judgment should be entered against the plaintiff because he had "offered no evidence that a continuing violation of the RCRA exists."

---

The 'discovery rule' rests on the idea that plaintiffs cannot have a tenable claim for the recovery of damages unless and until they have been harmed. Damage claims in cases involving hidden injuries or illnesses therefore are viewed as not accruing until the harm becomes apparent....

The rule EPA sponsors is of an entirely different sort. It is a 'discovery of violation' rule having nothing whatever to do with the problem of latent injuries. The rationale underlying the discovery of injury rule—that a claim cannot realistically be said to accrue until the

claimant has suffered harm—is completely inapposite.

*Id.* at 1460.

The issue of whether a "discovery rule" would operate to toll a statute of limitations applying to civil actions brought under the Hazardous Waste Management Act was not raised in the appeal now before this Court. Thus, we decline to address this issue in this case.

**18.** The legislature uses the terms "Resource Conservation and Recovery Act" and "Solid Waste Disposal Act" interchangeably to describe the Act found at 42 U.S.C. § 6901 *et seq.*

*Id.* at 1040. The plaintiff brought suit against the town alleging that it violated RCRA by allowing material from its landfill, which he alleged contained hazardous waste, to spread onto his property. This landfill was opened by the town in 1970, and through the years the landfill gradually spread onto the plaintiff's property. In 1989 the Town of Harrison closed the landfill at issue; however, the plaintiff did not file his suit against the town until September of 1990.

The Town of Harrison maintained that since it ceased using the landfill in 1989, the plaintiff has alleged only a *past* violation, which is not actionable under RCRA. Conversely, the plaintiff argued that the Town of Harrison's violation of RCRA could be ongoing.

The .district court noted that "[s]ection 7002(a)(1)(A) of RCRA permits citizens suits against any person 'who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to [RCRA].'" *Gache,* 813 F.Supp. at 1041 (*citing* 42 U.S.C. § 6972(a)(1)(A)). The district court further noted that "[t]he section continues by saying that '[a]ny action under paragraph (a)(1) of this subsection shall be brought in the district court for the district *in which the alleged violation occurred.*'" *Id.* (emphasis provided). The district concluded that

> [u]nder the plain meaning of the statute, the continued presence of illegally dumped waste could constitute being 'in violation' of a RCRA regulation or standard. The second quoted passage from (a)(1), stated in the past tense, clearly implies violations that have already occurred. Congress could have easily constructed this provision to rule out materials already discharged as a continuing violation by using a phrase such as 'in which the alleged violation is occurring.' Reading these provisions of (a)(1) together so as not to render the section contradictory, we conclude, as other courts have, that improperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA.... The environmental harms do not stem from the act of dumping when waste materials slide off the dump truck

but rather after they land and begin to seep into the ground, contaminating soil and water. So long as wastes remain in the landfill threatening to leach into the surrounding soil and water, a continuing violation surely may exist.... *In short, the disposal of wastes can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable.*

*Id.* at 1041–42 (emphasis added). We find the reasoning in the *Gache* case to be persuasive. *Cf. Sasser v. Administrator, United States Environmental Protection Agency,* 990 F.2d 127, 129 (4th Cir.1993) (In resolving a different issue under the Clean Water Act, the court noted that "[e]ach day the pollutant remains in the wetlands without a permit constitutes an additional day of violation." (citations omitted)); *United States v. Ciampitti,* 669 F.Supp. 684, 700 (D.N.J.1987) ("A day of violation constitutes every day that a violator allows illegal fill material to remain in federally regulated wetlands." (*citing United States v. Cumberland Farms of Conn.,* 647 F.Supp. 1166 (D.Mass.1986))). *But see United States v. Telluride Co.,* 884 F.Supp. 404, 408 (D.Colo.1995) (In concluding that the defendant's action of discharging pollutants in violation of the Clean Water Act was not continuing the court stated: "The fact that a continuing impact exists from [the defendant's] past violations does not render the violation continuing.").

Accordingly, we hold that the general one-year statute of limitations found in *W.Va. Code,* 55–2–12(c) [1959] "accrues" when any person "violates" or is "in violation" of "any provisions of [the Hazardous Waste Management Act found in *W.Va.Code,* 22–18–1 *et seq.*] or any permit, rule or order issued pursuant to [the Act]." *W.Va.Code,* 22–18–17(a)(1), 17(b) and 17(c) [1994]. Hazardous wastes which remain in the environment in amounts above the regulatory limits set pursuant to the Hazardous Waste Management Act constitute a continuing violation of the . Act.

█ In the case before us, the statute of limitations found in *W.Va.Code,* 55–2–12(c)

[1959] has not run for purposes of defeating a 12(b) motion under the *W.Va.R.Civ.P.* to dismiss a complaint, since the DEP's complaint alleges that the appellees are currently "in violation" of the Hazardous Waste Management Act as arsenic levels on the Kermit Lumber business site are in excess of the regulatory limits.[19]

19. We note that the United States Court of Appeals of the Ninth Circuit stated that "[c]ases addressing the ongoing violation theory under [42 U.S.C. § 6972 (1988) of RCRA] have required that to be an ongoing violator, a defendant must own, or perhaps control, the property where seepage is taking place." *Louisiana–Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1579 (9th Cir.1994), *cert. denied*, 513 U.S. 1103, 115 S.Ct. 780, 130 L.Ed.2d 674 (1995). We do not find this statement by the Ninth Circuit to require that the appellees in the case before us currently own or control the Kermit Lumber business site before the DEP may bring an action under the Hazardous Waste Management Act for three reasons.

First, the *Louisiana–Pacific* case only cites to two unpublished district court opinions to support its holding. *See Fallowfield Development Corp. v. Strunk*, No. CIV. A. 89–8644, 1990 WL 52745 (E.D.Pa. April 23, 1990) and *Coburn v. Sun Chemical Corp.*, No. CIV. 0120, 1988 WL 120739 (E.D.Pa. November 9, 1988).

Second, the reasoning used by the district courts in the unpublished opinions of *Coburn* and *Fallowfield* to reach their conclusion that a defendant "must own, or perhaps control, the property where seepage is taking place[ ]" in order to be an ongoing violator under RCRA, is not applicable to the facts we have before us. The district courts in *Coburn* and *Fallowfield* relied on the United States Supreme Court case of *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) in reaching their conclusions. Thus, it is necessary for us to explain the *Gwaltney* decision before explaining the district courts' conclusions.

The issue in *Gwaltney* was whether the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), authorizes citizen suits to be brought for wholly past violations of the Act. The Clean Water Act provided that private citizens could bring civil actions against any person " 'alleged to be in violation of' " the Act. *Id.* at 53, 108 S.Ct. at 379, 98 L.Ed.2d at 314 (*citing* 33 U.S.C. § 1365(a)(1)). The defendant in *Gwaltney* argued that the "alleged to be in violation" language of the Act, "requires that a defendant be violating the Act at the time of the suit." *Id.* at 54–55, 108 S.Ct. at 380, 98 L.Ed.2d at 315. The United States Supreme Court agreed and held that a citizen suit could not be maintained under the Clean Water Act for violations occurring prior to the filing of the complaint. Instead, a citizen suit could only be maintained "to enjoin or otherwise abate an ongoing violation." *Id.* at 59, 108 S.Ct. at 382, 98 L.Ed.2d at 318. *See Don't Waste Arizona, Inc. v. McLane Foods, Inc.*, 950 F.Supp. 972, 976 (D.Ariz.1997) (Acknowledges that *Gwaltney* was superseded by statute: Congress amended the citizen suit provision of the Clean Water Act to make clear that citizen suits may be brought for past and ongoing violation of the Act). Although the United States Supreme Court in *Gwaltney* held that a citizen suit could not be maintained for violations occurring prior to the filing of the complaint, the court acknowledged that the statutory language in the Clean Water Act clearly allowed the EPA to maintain an action for past as well as ongoing violations of the Act.

The district court in the unpublished decision of *Coburn, supra*, applied the above reasoning in *Gwaltney* to the facts before it stating that the citizen suit provision of the RCRA contained the same language as the citizen suit provision of the Clean Water Act. The court in *Coburn* concluded that

[s]ince Sequa has not owned or operated the site since 1972 and Athlone has not owned or operated the site since January 30, 1986, any alleged violations of RCRA by Sequa and Athlone would necessarily be 'wholly past' violations. Under the tenets of Gwaltney, plaintiffs' cause of action against Sequa and Athlone under [the citizen's suit provision] of RCRA would have to be barred.

*Coburn*, 1988 WL 120739, at *8. Thus, the district court's conclusion in *Coburn* that persons who neither own nor control the property where the seepage is taking place was made in the context of whether a citizen suit was being brought under RCRA for ongoing or wholly past violations of the Act. *Coburn*, as stated above, concluded that because the defendant no longer owned or controlled the site the violation of RCRA was "wholly past" and, therefore, the citizens suit could not be maintained. The district court in the unpublished case of *Fallowfield, supra*, applied the above reasoning from *Coburn* and concluded that a RCRA citizens action was allowed in the case before it because the plaintiffs had shown that the defendants retained equitable ownership of property because its recent sale was fraudulent. In that the case before us does not involve a citizens suit, the decisions of *Coburn* and *Fallowfield* are inapplicable.

The third reason we find the Ninth Circuit's statement in *Louisiana–Pacific* to be inapplicable in the case before us is that our Hazardous Waste Management Act does not expressly state that the DEP may only bring an action under the Act against persons who own or control the site where a hazardous waste is found. Indeed, the Hazardous Waste Management Act states that "[n]o *person* may own, construct, modify, operate *or* close any facility or site for the treatment, storage or disposal of hazardous waste[.]" *W.Va. Code*, 22–18–8(a) [1994], in relevant part (emphasis added). The use of "or" in *W.Va.Code*, 22–18–8(a) [1994] indicates that the legislature did

## D.—The Water Pollution Control Act Count

We now consider, as we did under the Hazardous Waste Management Act, whether there is a statute of limitations which applies to the count in the civil action brought by the DEP under the Water Pollution Control Act, found in *W.Va.Code*, 22–11–1, *et seq.*, and if so, when that statute of limitations begins to run.

### Is there a relevant statute of limitations?

As previously explained, the DEP alleged in count 2 of its complaint that the appellees had violated *W.Va.Code*, 22–11–8(b)(1) [1994] "by allowing industrial wastes, namely arsenic, or the effluent therefrom, emanating from a point source, to flow into waters of the State without a permit." Thus, the DEP sought to impose a civil penalty not to exceed $10,000.00 for each day the appellees are in violation of the Water Pollution Control Act. *See W.Va.Code*, 22–11–22 [1994].

Under the Water Pollution Control Act the DEP may bring enforcement proceedings against any person who without a permit therefor allows "sewage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source, to flow into the waters of this state[.]" *W.Va.Code*, 22–11–8(b)(1) [1994].[20] The DEP may enter orders "directing such person to stop such pollution or the violation of the rule or effluent limitation of the [environmental quality] board or director [of the DEP], or make and enter an order directing such person to take corrective or remedial

action." *W.Va.Code*, 22–11–15 [1994], in relevant part. The DEP may also seek civil penalties against "any person who violates any provision of [the Water Pollution Control Act] or of any rule or who violates any standard or order promulgated or made[.]" *W.Va.Code*, 22–11–22 [1994]. "Any such civil penalty may be imposed and collected only by a civil action instituted by the director [of the DEP] in the circuit court of the county in which the violation occurred or is occurring or of the county in which the waters thereof are polluted as the result of such violation[.]" *Id.*, in relevant part. Furthermore, the DEP may ask the circuit court to issue an injunction to "compel compliance with and enjoin violations of the provisions of [the Water Pollution Control Act.]" *Id.*, in relevant part.[21]

The record before us does not indicate that the DEP entered any orders or filed any civil actions under the Water Pollution Control Act prior to the filing of the suit which is now before us. Indeed, it appears that the DEP raised the Water Pollution Control Act for the first time in the complaint filed on September 15, 1995—almost seven years after the appellees vacated the Kermit Lumber business site.[22]

Like the Hazardous Waste Management Act, the Water Pollution Control Act does not require the DEP to enter orders or file civil actions within a specified time period. Indeed, the Water Pollution Control Act is silent as to whether there are any applicable statutes of limitations.

---

not intend that *only* owners of a site be subject to the mandates of the Hazardous Waste Management Act. Moreover, the definition of "person" does not include or mandate that the "person" be an owner of or in control of the site where the hazardous waste is located: "Person" is defined under the Act as "any individual, trust, firm, joint stock company, public, private or government corporation, partnership, association, state or federal agency, the United States government, this State or any other state, municipality, county commission or any other political subdivision of a state or any interstate body[.]" *W.Va.Code*, 22–18–3(11) [1994].

**20.** "Effluent limitation" is defined as "any restriction established on quantities, rates and concentrations of chemical, physical, biological and other constituents which are discharged into the

waters of this state[.]" *W.Va.Code*, 22–11–3(9) [1994].

"Point source" is defined as "any discernable, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock or vessel or other floating craft, from which pollutants are or may be discharged[.]" *W.Va. Code*, 22–11–3(16) [1994].

**21.** The DEP may also seek the imposition of criminal penalties pursuant to *W.Va.Code*, 22–11–24 [1994]. However, this section is not before us.

**22.** As previously noted, the appellees vacated the Kermit Lumber business site and gave up the lease on May 31, 1988.

Because the Water Pollution Control Act is silent, we conclude, as we did when discussing the Hazardous Waste Management Act, that the general limitations of actions and suits in Chapter 55, article 2 of the *West Virginia Code* apply. More specifically, as we have previously explained, *W.Va.Code,* 55–2–12(c) [1959] clearly and unambiguously states that *"[e]very* personal action[23] *for which no limitation is otherwise prescribed shall be brought* ... within one year next after the right to bring the same shall have accrued[.]" (emphasis and footnote added). Thus, this Court must apply *W.Va.Code,* 55–2–12(c) [1959] to civil actions brought under the Water Pollution Control Act. *See* syl. pt. 2, *Keen, supra* (When a statute is clear and unambiguous it is the duty of the Court not to construe but to apply the statute).

■ Accordingly, we hold that *W.Va. Code,* 55–2–12(c) [1959], which clearly and unambiguously states that "[e]very personal action for which no limitation is otherwise prescribed shall be brought ... within one year next after the right to bring the same shall have accrued if it be for any other matter of such a nature that, in case a party die, it could not have been brought at common law by or against his personal representative[,]" applies to civil actions brought under the Water Pollution Control Act found in *W.Va.Code,* 22–11–1 *et seq.*

### When does the relevant statute of limitations begin to run?

This Court must now consider when *W.Va. Code,* 55–2–12(c) [1959] begins to run in a civil action brought under the Water Pollution Control Act. As previously noted, *W.Va. Code,* 55–2–12(c) [1959] states: "Every personal action for which no limitation is otherwise prescribed shall be brought ... *within one year next after the right to bring the same shall have accrued* [.]" (emphasis added). The question is when does the right to bring a civil action under the Water Pollution Control Act "accrue."

As in our discussion of the Hazardous Waste Management Act, we find that we must examine the language used by the legislature in the Water Pollution Control Act in order to ascertain and give effect to the legislature's intent because the language in *W.Va.Code,* 55–2–12(c) [1959] is not helpful in ascertaining what the legislature meant by "accrue" in the context of an enforcement proceeding brought pursuant to the Water Pollution Control Act. *See* syl. pt. 2, *Hott, supra* (When construing a statute the primary object is to ascertain and give effect to the legislature's intent). *See also* syl. pt. 3, *Hott, supra* (When ascertaining the legislature's intent " 'effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' " (citation omitted)).

The legislature explained the purpose of the Water Pollution Control Act in *W.Va. Code,* 22–11–2 [1994], which states:

(a) It is declared to be the public policy of the state of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.

(b) It is also the public policy of the state of West Virginia that the water resources of this state with respect to the quantity thereof be available for reasonable use by all of the citizens of this state.

In order to accomplish its goals, the legislature designated the DEP "[t]o perform any and all acts necessary to carry out the purposes and requirements of [the Water Pollution Control Act] and of the 'Federal Water Pollution Control Act,'[24] as amended, relating to this state's participation in the 'Nation-

---

**23.** *See* n. 14, *supra* (Explains why an action under the Water Pollution Control Act is a "personal action" rather than a "real action" or "mixed action.")

**24.** The Federal Water Pollution Control Act is found in 33 U.S.C. § 1151 *et seq.* and is also known as the Clean Water Act. *See United States v. Gurley,* 43 F.3d 1188, 1191 (8th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995).

al Pollutant Discharge Elimination System' established under that act[.]" *W.Va.Code,* 22–11–4(a)(1) [1994] (footnote added).

At issue is the DEP's authority to carry out the purposes of the Act by imposing civil penalties and instituting civil actions pursuant to *W.Va.Code,* 22–11–22 [1994]. Similar to the Hazardous Waste Management Act, the Water Pollution Control Act also uses a form of the term "violates" in describing when the DEP may use its authority to impose civil penalties or institute civil actions. More specifically, *W.Va.Code,* 22–11–22 [1994], in relevant part, states that

> any person who *violates* any provision of [the Water Pollution Control Act] or of any rule or who *violates* any standard or order promulgated or made and entered under the provisions of [the Water Pollution Control Act] ... is subject to a civil penalty.... Any such civil penalty may be imposed and collected only by a civil action instituted by the director [of the DEP] in the *circuit court of the county in which the violation occurred or is occurring* or of the county in which the waters thereof are polluted as the result of such violation.

(emphasis added). *W.Va.Code,* 22–11–22 [1994] further provides, in relevant part, that the DEP may seek an injunction in the circuit courts in order to "compel compliance with and enjoin *violations* of the provisions of [the Water Pollution Control Act], the rules of the [environmental quality] board or director [of the DEP]." (emphasis added).

Clearly, the legislature intended for civil penalties to be imposed or injunctions entered when any person "violates" the Water Pollution Control Act, when the "violation occurred or is occurring" or to "enjoin violations" of the Act. Thus, a claim would "accrue" when any person "violates" or when a "violation occurred or is occurring" under the provisions of the Water Pollution Control Act. *Id.*

In the case before us, the DEP has alleged in its complaint that the arsenic currently remains in the soil at the Kermit Lumber business site in amounts above the regulatory limits and that the "arsenic contaminated soil, has caused the contamination of the surface waters of the Tug Fork river."

Therefore, we conclude that because the DEP has alleged in its complaint that a "violation ... is occurring" under the Water Pollution Control Act, the statute of limitations has not yet begun to run. This construction of the Water Pollution Control Act is further supported by the following language found in *W.Va.Code,* 22–11–20 [1994], in relevant part:

> No right to violate the rules of the [environmental quality] board or director [of the DEP] or to continue existing pollution of any of the waters of the state exists nor may such right be acquired by virtue of past or future pollution by any person. The right and control of the state in and over the quality of all waters of the state are hereby expressly reserved and reaffirmed. It is recognized that with the passage of time, additional efforts may have to be made by all persons toward control and reduction of the pollution of the waters of the state, irrespective of the fact that such persons may have previously complied with all orders of the director or board. It is also recognized that there should be continuity and stability respecting pollution control measures taken in cooperation with, and with approval of, the director, or pursuant to orders of the director or board. When a person is complying with the terms and conditions of a permit granted pursuant to the provisions of section eleven [22–11–11] of this article or when a person has completed remedial action pursuant to an order of the director or board, additional efforts may be required wherever and whenever the rules of the board or director or effluent limitations are violated or the waters of the state are polluted by such person.

Thus, a construction of the Water Pollution Control Act which allows the DEP to seek civil penalties or an injunction for an ongoing violation of the Act gives "effect to the intent of the Legislature." Syl. pt. 2, *Hott, supra. See also Reaves,* 923 F.Supp. at 1534 (The court concluded that "unpermitted discharge of dredged or fill materials into wetlands on the site is a continuing violation for as long as the fill remains[ ]" under the Clean Water

Act which is also known as the Federal Water Pollution Control Act).

Accordingly, we hold that the general one-year statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] "accrues" when any person "violates any provision of [the Water Pollution Control Act, found in *W.Va.Code*, 22–11–1 *et seq.*] or of any rule or who violates any standard or order promulgated or made and entered under the provisions of [the Act]" or when a "violation occurred or is occurring" under the Act. *W.Va.Code*, 22–11–22 [1994]. Thus, any "sewage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source [and currently] flow[ing] into the waters of this state[,]" *W.Va.Code*, 22–11–8(b)(1) [1994], in violation of any provision of the Water Pollution Control Act constitutes a continuing violation of the Act.

In the case before us, the statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] has not run for purposes of defeating a 12(b) motion under the *W.Va.R.Civ.P.* to dismiss the complaint, since the DEP's complaint alleges that the appellees are currently *violating* the Water Pollution Control Act as the arsenic levels at the Kermit Lumber business site are in excess of the regulatory limits and are currently flowing into the waters of this State.

### E.—The Public Nuisance Count

Finally, we consider whether there is a statute of limitations which applies to the public nuisance count of the DEP's complaint, and if so, when that statute of limitations begins to run.

#### *Is there a relevant statute of limitations?*

As previously noted, the DEP alleged in count 3 of its complaint that the appellees "are liable under the theory of common law public nuisance because of their acts and/or because of their failing to perform their required legal duty and by causing conditions to exist which endangers public health, safety and the environment." The DEP sought compensatory and punitive damages from the appellees for their public nuisance.

In *Sharon Steel Corp. v. City of Fairmont*, 175 W.Va. 479, 483, 334 S.E.2d 616, 620 (1985), *case dismissed by* 474 U.S. 1098, 106 S.Ct. 875, 88 L.Ed.2d 912 (1986), this Court explained the general meaning of a public nuisance:

'A public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons. The distinction between a public nuisance and a private nuisance is that the former affects the general public, and the latter injures one person or a limited number of persons only. Ordinarily, a suit to abate a public nuisance cannot be maintained by an individual in his private capacity, as it is the duty of the proper public officials to vindicate the rights of the public.'

*(quoting Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595–96, 34 S.E.2d 348, 354 (1945)). We recognized in *Sharon Steel Corp.* that "[n]uisance law has been particularly effective in addressing environmental problems." *Id.* at 484, 334 S.E.2d at 621. As we acknowledged,

'[t]here is simply no common law doctrine that approaches nuisance in comprehensiveness or detail as a regulator of land use and of technological abuse. Nuisance actions have involved pollution of all physical media—air, water, land—by a wide variety of means.... Nuisance actions have challenged virtually every major industrial and municipal activity which is today the subject of comprehensive environmental regulation—the operation of land fills, incinerators, sewage treatment facilities, activities at chemical plants, aluminum, lead and copper smelters, oil refineries, pulp mills, rendering plants, quarries and mines, textile mills and a host of other manufacturing activities.... Nuisance theory and case law is the common law backbone of modern environmental and energy law.'

*Id. (quoting* W. Rodgers, Jr., *Handbook on Environmental Law* § 2.1 at 100 (1977)). With the above general discussion of public nuisance in mind, we now examine whether there is a relevant statute of limitations.

We have not found a specific statute of limitations addressing the type of public nuisance alleged in the DEP's complaint nor

have the parties cited to such a statute. Thus, we must turn to the general provisions governing limitation of actions and suits found in *W.Va.Code,* 55–2–1 *et seq.* More specifically, we find that *W.Va.Code,* 55–2–12 [1959] clearly and unambiguously applies to the DEP's allegations of public nuisance. *See* syl. pt. 2, *Keen, supra* (When a statute is clear and unambiguous it is the duty of the Court not to construe but to apply the statute). *W.Va.Code,* 55–2–12 [1959], as previously quoted, states:

> Every personal action [25] *for which no limitation is otherwise prescribed shall be brought:* (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) *within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.*

(emphasis and footnote added).

As noted above, the DEP sought to hold the appellees liable under a common law public nuisance theory because "of [the appellees'] acts and/or because of their failing to perform their required legal duty and *by causing conditions to exist which endangers public health, safety and the environment.*" (emphasis added). The DEP's allegation of public nuisance does not encompass damages to property owned by the DEP nor does it encompass damages for personal injuries to the DEP. Instead, the DEP is seeking damages for the harm caused to the "public health, safety and the environment." Therefore, the DEP's public nuisance claim falls within the one-year statute of limitations for "any other matter" quoted above in *W.Va. Code,* 55–2–12(c) [1959] rather than the two-year statute of limitations for property damages or personal injuries. Accordingly, we conclude that the one-year statute of limita-

tions found in *W.Va.Code,* 55–2–12(c) [1959] is the relevant statute of limitations.

### *When does the relevant statute of limitations begin to run?*

The final issue for this Court is at what point does *W.Va.Code,* 55–2–12(c) [1959] begin to run in an action alleging that hazardous wastes at a business site is a public nuisance which "endangers public health, safety and the environment." As we have previously noted, *W.Va.Code,* 55–2–12(c) [1959] states: "Every personal action for which no limitation is otherwise prescribed shall be brought ... *within one year next after the right to bring the same shall have accrued*[.]" (emphasis added). The question is when does the right to bring an action alleging that hazardous wastes at a business site is a public nuisance which "endangers public health, safety and the environment" "accrue."

In order to answer the above question, we must determine whether the public nuisance alleged in the DEP's complaint is "permanent" or "temporary" in nature. This Court has stated that

> '[t]he authorities agree that when the original act creating a nuisance to land is permanent in its nature, and is at once productive of all the damage which can ever result from it, and that once destroys the estate for all practical purposes, so that when the act is completed all the damage that can be effected thereby is consummated, the entire damages must be recovered in one action, and the statute of limitations begins to run against the cause of action from the time of the complete erection of the nuisance.'

*Pickens v. Coal River Boom & Timber Co.,* 66 W.Va. 10, 17, 65 S.E. 865, 867–68 (1909) (*quoting St. Louis Ry. Co. v. Biggs,* 20 Am. St. R 176). *See also Patrick v. Sharon Steel Corp.,* 549 F.Supp. 1259, 1262 n. 7 (N.D.W.Va.1982); 58 Am.Jur.2d *Nuisances* § 27 (1989) ("A permanent nuisance has been variously described ... as a type of nuisance where by one act a permanent injury is done,

---

**25.** *See* n. 14, *supra* (Explains why a nuisance action is a "personal action" rather than a "real

action" or "mixed action.")

... being at once necessarily productive of all the damage which can ever result from it." (footnotes omitted)).

However, "[d]amages are 'temporary' if 'they are continuous and repeated suits may be maintained as damage goes on[.]'" *Patrick,* 549 F.Supp. at 1262 n. 7 (*quoting Pickens,* 66 W.Va. at 16, 65 S.E. at 867). *See also Handley v. Town of Shinnston,* 169 W.Va. 617, 619, 289 S.E.2d 201, 202 (1982) (" '[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from the date of the last injury, or when the tortious overt acts cease.'" (*quoting* 54 C.J.S. *Limitations of Actions,* § 169 (1948))); 58 Am.Jur.2d *Nuisances* § 28 ("It has been said that a temporary nuisance is one where there is but a temporary interference with the use and enjoyment of property, and that, if a nuisance is a use which may be discontinued at any time, it is considered continuing in character." (footnotes omitted)). *See also Hargreaves v. Kimberly,* 26 W.Va. 787 (1885) (Describes the distinction between permanent and temporary nuisances); *Guinn v. Ohio River Railroad Co.,* 46 W.Va. 151, 33 S.E. 87 (1899).

Although, as indicated by the definitions above, the distinction between a "permanent" nuisance and a "temporary" nuisance is crucial to determining when a statute of limitations "accrues" in a nuisance action, *see* 58

Am.Jur.2d *Nuisances* § 308 (1989), it is often difficult to make such a distinction:

[I]t has been said that the terms temporary and permanent nuisance are, in reality, often only short-hand conclusions to determine the outcome of a particular case or the legal effects of certain defenses, such as the statute of limitations. Thus, it is often difficult to distinguish between nuisances that are permanent in character and those that are not.

Various rules or tests have been laid down for determining the classification of nuisances as permanent or temporary, but the distinctions between permanent nuisance and continuing or temporary nuisances are not always clearly delineated, and no short and all-inclusive rule or test has evolved. Rather, it seems that the cases must be decided in accordance with exact precedents rather than on principle. In many instances the distinction depends upon the particular facts, the measure of damages, whether the condition is negligently operated, or whether it is reasonably practicable for the condition to be abated.

*The view has been expressed that whether a nuisance will be classified as continuing or permanent depends not on the offending party's interest in continuing the nuisance, but on the type of harm suffered.*

58 Am.Jur.2d *Nuisances* § 26 (1989) (footnotes omitted and emphasis added).[26] *See*

---

**26.** There are several tests which have been used to distinguish a "permanent" and "temporary" nuisance. One such test has been stated as follows: "It has been said to be the character of the source of injury rather than the character of the injury which determines between a temporary or permanent nuisance." 58 Am.Jur.2d *Nuisances* § 30 (1989) (footnote omitted). Another test, known as the "ability to abate" test, has been explained as follows:

[I]t is said that a nuisance is temporary or continuing where it is remediable, removable, or abatable, or if abatement is reasonably and practicably possible, or, according to some cases, where it is abatable at a reasonable cost, or by the expenditure of labor or money, by the defendant, or by legal process at the instance of the injured party, against the will of the person creating it. On the other hand, a nuisance is permanent if abatement is impracticable or impossible. Injuries to land are incapable of repair and thus permanent in nature

when things attached to the land, such as timber, trees, soil, and buildings, are removed or destroyed.

58 Am.Jur.2d *Nuisances* § 29 (1989) (footnotes omitted). "Lawfulness of structure" is yet another test used to distinguish "permanent" and "temporary" nuisance and has been explained as follows:

[i]t has been said that in order to be considered a permanent nuisance a structure which constitutes or causes the nuisance must be lawful, for where such structure is unlawful a presumption arises that the force of law will be brought to bear so as to eradicate the illegality. As a consequence, under this view, a nuisance stemming from an unlawful structure is deemed to be temporary. Under this view, lawful structures which constitute or cause a nuisance are regarded as permanent despite the fact that the resultant nuisance is abatable[.]

58 Am.Jur.2d *Nuisances* § 31 (1989) (footnotes omitted). *See also* 66 C.J.S. *Nuisances* § 5

*also* 66 C.J.S. *Nuisances* § 5 (1950) ("The distinction between permanent and continuing nuisances is not always clear." (footnote omitted)); Michael A. DiSabatino, Annotation, *When Statute of Limitations Begins to Run as to Cause of Action for Nuisance Based on Air Pollution* 19 A.L.R.4th 456 at § 2, 1983 WL 191035 (1983) ("[A]lthough the courts appear to be in agreement as to which rule to apply once it is determined whether a particular air pollution nuisance is permanent or temporary, the initial determination as to which category to allocate a particular nuisance leads to widely varying results.").[27]

The United States Court of Appeals of the Ninth Circuit focused its attention on the "type of harm suffered" rather than on the offending party's interests in continuing the nuisance in *Arcade Water District v. United States,* 940 F.2d 1265 (9th Cir.1991). In *Arcade* the court was confronted with whether the Arcade Water District's property nuisance tort suit under the Federal Tort Claims Act, for contamination of its water well by a military laundry was barred by the statute of limitations.

The Arcade Water District was a public agency supplying water for domestic use. The well at issue in the case had been owned and operated by the Arcade Water District since 1956. The United States operated a military laundry near the well from 1941 until 1973. In 1981, almost 8 years after the military laundry closed, the Arcade Water District discovered that the contamination of its well was caused by materials coming from the old military laundry. However, the Arcade Water District did not file an action for the well contamination until 1984. Thus, the United States argued that the two-year statute of limitations barred the Arcade Water District's claim.

The Ninth Circuit disagreed. In arriving at its conclusion the Ninth Circuit had to determine whether the Arcade Water District's property nuisance tort action against the United States alleged a "permanent" nuisance or a "temporary" nuisance under California law. The court recognized that in California the crucial distinction between a "permanent" and "continuing" nuisance " 'is whether the nuisance may be discontinued or abated.' " *Arcade,* 940 F.2d at 1268 (*quoting Mangini v. Aerojet–General Corp.,* 230 Cal. App.3d 1125, 281 Cal.Rptr. 827, 840 (1991)). Moreover, the Ninth Circuit noted that in California a continuing overt act by a defendant is not needed to establish a continuing nuisance: " '[P]laintiff's land may be subject

---

(1950) (Describes the various tests discussed above that have been used to distinguish permanent and temporary nuisances).

**27.** Indeed, our case law is not particularly helpful. For example, in *Keene v. City of Huntington,* 79 W.Va. 713, 724–25, 92 S.E. 119, 124 (1917) this Court concluded that injuries from a permanent incinerator plant which emitted offensive odors was a permanent nuisance:

[W]here the injury to real estate is such as to affect its value permanently, permanent damages can be recovered for that injury; or, if the character of the agency, from the operation of which the injury arises, is such that it can reasonably be expected to continue for an indefinite time, and its operation in the ordinary and proper way produces the injury complained of, the plaintiff not only can, but he must, if he would recover damages at all, sue and recover permanent damages. He can have but one suit for the purpose.

However, in a case in which the plaintiff was seeking compensation for damages to her property caused from waste materials from a strip mine upstream which would float downstream and block the stream causing flooding on the

plaintiff's property, this Court concluded that the nuisance was temporary:

[W]here the cause of injury is in the nature of a nuisance, and not permanent in character, but such that it may be supposed that the defendant would remove it rather than suffer at once entire damages, which it might inflict if permanent, then the entire damages, so as to include future damages, can not be recovered in a single action, but actions may be maintained from time to time as long as the cause of the injury continues.

*O'Dell v. McKenzie,* 150 W.Va. 346, 350, 145 S.E.2d 388, 391 (1965) (citation omitted).

In any event, not only are *Keene, supra,* and *O'Dell, supra,* less than helpful in helping us to formulate a way of distinguishing a "permanent" nuisance from a "temporary" nuisance, but they are distinguishable from the case before us. Both of those cases involve a plaintiff who is seeking some form of compensation for damages to real property. Their actions are for a private nuisance rather than a public nuisance. Thus, the harm in *Keene* and *O'Dell* is different than the harm the DEP is seeking to eradicate in the case before us. In other words, the harm in our case is not to the DEP's real property, rather it is to the public health, safety and environment.

to a continuing nuisance even though defendant's offensive conduct ended years ago. That is because the 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur.'" *Id.* (*quoting Mangini*, 281 Cal.Rptr. at 841).

The Ninth Circuit noted that the Arcade Water District alleged that the laundry, although not operational, continued to leach contaminants into its well. Thus, the Ninth Circuit held that it could not conclude as a matter of law that the nuisance was permanent because "[a]ccording to Arcade's allegations the laundry leaching is not a single, but rather a continuing act, and the injury to [the well] may not be permanent, but rather temporary." *Id.* at 1268.

We find the reasoning in *Arcade* to be persuasive. Moreover, "under federal common law notions, a public nuisance is by nature continuous or recurring." *In re Oswego Barge Corp.*, 439 F.Supp. 312, 322 (N.D.N.Y.1977) (*citing State of Maryland, Dept. of Natural Res. v. Amerada Hess Corp.*, 350 F.Supp. 1060 (D.Md.1972)). *See also* 58 Am.Jur.2d *Nuisances* § 37 (1989). A public nuisance action usually seeks to have some harm which affects the public health and safety abated.[28] Thus, until such harm is abated, the public nuisance is continuing and the statute of limitations does not accrue.[29]

■ In the case before us, the harm the DEP is complaining of is the endangerment to "public health, safety and the environment." As long as the arsenic remains on the Kermit Lumber business site in amounts above the regulatory limits and as long as the arsenic is flowing into the Tug Fork River, the harm or nuisance continues and thus, is a continuing (or temporary) nuisance. It is inconceivable that the arsenic caused all the damage it could prior to 1988 when the appellees vacated the business site. Indeed, the DEP's complaint alleges that the harm from the arsenic continues to endanger the "public health, safety and the environment," and will continue to endanger the "public health, safety and the environment" until the arsenic is removed. Thus, based on the allegations in the DEP's complaint, the one-year statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] has not accrued and will not accrue until the arsenic levels at the Kermit Lumber site no longer endanger "the public health, safety and the environment."

■ Accordingly, we hold that when a public nuisance action is brought in order to remediate a business site containing hazardous waste found in the soil and flowing into the waters of this State, the one-year statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] does not accrue until the harm or endangerment to the public health, safety and the environment is abated. Therefore, in the case before us, we conclude that the statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] has not run for purposes of defeating a 12(b) motion under the *W.Va. R.Civ.P.* to dismiss a public nuisance count in a complaint when the complaint alleges that

28. The term "public nuisance" does not have an exact definition. *See* 58 Am.Jur.2d *Nuisances* § 35 (1989). Generally, it has been described as "the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public[.]" *Id.* (footnotes omitted).

29. We make clear that in the case before us, we are only concerned with a public nuisance involving hazardous waste which is found in the soil and leaching into a river. A different public nuisance action may warrant a different analysis. Moreover, a private nuisance action is different from a public nuisance action, and thus, could also warrant a different analysis.

Furthermore, in that a nuisance is a tort, we acknowledge that generally "[a] continuing tort

sufficient to toll a statute of limitations is occasioned by *continual unlawful acts,* not by continual ill effects from an original violation, and for there to be a continuing tort there must be a continuing duty." 54 C.J.S. *Limitations of Actions* § 177 (1987) (emphasis added and footnotes omitted). However, we find this general proposition to be unworkable in the context of a public nuisance action to remediate a business site containing hazardous waste which is endangering the "public health, safety and the environment." The object of a public nuisance action is to abate or stop the harm to the "public health, safety and the environment[,]" which will continue until the hazardous waste is removed rather than until the acts of the persons in placing the hazardous waste in the soil abate.

the public nuisance continues to endanger "the public health, safety and the environment."

## III.

In summary, this Court has concluded that the statute of limitations found in *W.Va.Code*, 55–2–12 [1959] applies to the DEP's action because of the express language in *W.Va. Code*, 55–2–19 [1923] which clearly and unambiguously states that "[e]very statute of limitation, unless otherwise expressly provided, shall apply to the State." We also concluded that because the appellees are currently "in violation" of the Hazardous Waste Management Act and the Water Pollution Control Act, the one-year statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] has not accrued. Lastly, we concluded that because the DEP alleged that the public nuisance (the arsenic) continues to endanger the public health, safety and the environment, the one-year statute of limitations found in *W.Va.Code*, 55–2–12(c) [1959] has not accrued. Therefore, based on the allegations in the DEP's complaint, the trial judge erred in concluding that the statute of limitations barred the DEP's action. Accordingly, we reverse the April 4, 1996 order of the Circuit Court of Mingo County and remand for further proceedings consistent with this opinion.

Reversed and remanded.

MAYNARD, J., deeming himself disqualified, did not participate in the decision of this case.